**Affirmed as Modified; Opinion Filed June 9, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

No. 05-13-00070-CR
No. 05-13-00084-CR
No. 05-13-00090-CR

**DOCK TYRONE MURRAY, JR., Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause Nos. F11-45384-V, F11-45385-V, F11-45386-V**

## OPINION

Before Justices Lang-Miers, Myers, and Lewis
Opinion by Justice Myers

A jury convicted appellant Dock Tyrone Murray, Jr. of three aggravated robbery offenses and assessed a punishment of three concurrent terms of fifty-five years in prison. In ten issues, appellant alleges he received ineffective assistance of counsel, the trial court erred by overruling his voir dire challenges for cause, the evidence is insufficient to support the convictions, and the trial court abused its discretion by allowing the two accomplice witnesses to testify despite an alleged violation of "the Rule." As modified, we affirm the trial court's judgments.

### BACKGROUND AND PROCEDURAL HISTORY

On the evening of Tuesday, December 21, 2010, at around 8:30 p.m., Sheresa Tuggle and a friend from California, Kyle Shubel, visited the Zone D'Erotica adult lingerie and novelty store on Central Expressway at Spring Valley Road in Richardson, Texas. Tuggle and her friend were

browsing the t-shirts when she noticed three men enter the store—a white male, an Hispanic male, and a black male. Tuggle noticed the men were wearing heavy coats, which seemed odd since it was unseasonably warm that day. The Hispanic male moved towards her and told her to go to the counter, where he took the money out of her purse. When she told him to put it back, the white male, who by that point was standing behind the counter, told her to face the wall. In addition to approximately $130 in cash, the Hispanic male took Tuggle's driver's license, the key to her truck, and a couple of house keys. The black male took Shubel's watch and Blackberry. Tuggle testified that after the men took their belongings, she and her friend were told to go into a back room and lay face down on the carpet. She noticed that the cashier, who was forced to lie down on the ground with them, was very upset. The cashier begged the men not to kill her and repeatedly told them she had two children. One of the men replied that if she wanted her children to have a "happy Christmas," she should stay on the floor and do what she was told. Tuggle got up when she thought she heard the three men leave the store. After making sure they were gone, she and Shubel used a fax machine to call 911.

Shubel testified that he and Sherry Tuggle were looking at t-shirts at the Zone D'Erotica when a black male wearing a bulky coat approached him and told him to move over to the counter. When Shubel hesitated to move towards him, thinking it was store security or perhaps a joke, the individual gestured towards his right hand. Shubel could see he had a pistol. Shubel said he was familiar with firearms because he had been an NRA member for nearly two decades and produced video games that required him "to do a significant amount of research on profiles and appearance of firearms." The gun he saw was not a toy, and he thought it looked like an 82 Beretta. He said that once they got to the counter, the black male began frisking him, taking his Blackberry, his wallet, and his watch. After the men went through the cash register and Tuggle's purse, they took them to the back room and told them to lay on the ground. He said the men

asked for the tapes from the store's video surveillance system and when they were told it was a "satellite surveillance system," they threw the computer monitor to the ground. Shubel recalled that the store's cashier, who was with Shubel and Tuggle in the back room, "was noticeably afraid and freaking out."

Tera Mitchell, the cashier who was working at the Zone D'Erotica on the night of the robbery, testified that she saw three men—a white male, a black male, and a man who appeared to be Hispanic—enter the store at approximately 8:30 p.m. She was talking to the white male in a "caged" or "sectioned" area at the back of the store (which contained pornographic videos and various adult devices) when she noticed he was wearing a jacket, shorts, and black gloves, which was odd given the warm weather. She became suspicious and returned to the register and removed the money from that day and hid it, leaving $50 in the register. Eventually, the white male went over to the counter, climbed over it, and opened the register. He took the money from the cash register and went through Mitchell's purse, taking her "money and stuff." She did not see the two customers in the store until she was told to go to the back room. She said the black male had a tattoo scar under his eye and was the one holding the gun when they were in the back room. The only thing he said to her was that if she did not cooperate "no one would have a Merry Christmas." When they were in the back room, the robbers also ordered Mitchell to open the store safe. She told them that she could not do that but she "could call someone and get it open for them." Mitchell testified that the robbers "didn't want to do that."

Tuggle, Shubel, and Mitchell all identified appellant from photographic lineups and in court as the black male who participated in the robbery. On the night of the robbery, Tuggle was shown photographic lineups but was unable to identify anyone. Nine days later, on December 30, 2010, she was shown another photographic lineup and identified all three individuals involved in the robbery, but testified she was only "about 50 percent" certain of her identification

of appellant as the black male she saw because his back was turned to her almost the entire time and she rarely saw his face. Tuggle remembered, however, that the bridge of his nose "was distinctive with the eyes." The morning that she testified in court, Tuggle viewed a photographic lineup and identified appellant in court as one of the individuals who committed the robbery. After Tuggle identified appellant, the in-store video surveillance footage was played for the jury. Watching the video footage from one of the store's surveillance cameras, she noted that a black male wearing an orange baseball cap could be seen "meandering" around the store shortly before the robbery, and that the same video feed later showed him holding a gun. Shubel testified that when he selected appellant's photograph from the lineup, he was "[i]n excess of 50 percent" sure of his identification of the man because he had gotten a good look at his face. Shubel also identified appellant in court. Mitchell testified that she did not identify anyone in the first photo lineup the police showed her but did make an identification from a photo lineup shown to her on December 30, 2010, and she testified she was "a hundred percent sure" of her identification. She identified appellant in court as the black male she saw in the store that day.

The lead detective in the case was Adam Perry, with the Richard Police Department's Crimes Against Persons (CAPERS) unit. He testified that he interviewed the three complaining witnesses (Mitchell, Shubel, and Tuggle), viewed the video surveillance footage, consulted a database of law enforcement agencies for assistance in identifying suspects, and decided to release the surveillance video to the media. Following the media release, the Richardson Police Department received several tips identifying the white male suspect in the surveillance footage as Tommy McClendon. About one week later, a jailer at the Dallas County Jail contacted the Richardson police and identified the Hispanic suspect as Eric Ellis. Perry examined Ellis's driver's license and jail book-in photos, and found him to be the "spitting image" of the Hispanic individual seen in the surveillance footage. After Tera Mitchell identified Ellis in a photographic

lineup as one of the suspects—Perry noted Ellis was "light-complected" and had a receding hairline and a mole on the top of his head—Perry obtained a warrant for Ellis's arrest.

The Richardson police soon learned Ellis's mother lived in Farmer's Branch. Perry went to the mother's residence along with officers from the Farmer's Branch Police Department. When the officers knocked on the door, Ellis answered. Perry immediately recognized Ellis and took him into custody.

Ellis was transported to the Richardson Police Department, where Perry read him his *Miranda* rights and interviewed him. During the interview, Ellis admitted to his involvement in the Zone D'Erotica robbery and provided information regarding appellant. He told Perry that he, appellant, and the white male suspect, who he knew as "White Chocolate" (he did know the individual's real name), committed the robbery. He positively identified appellant as the black male suspect in the robbery. Ellis also told Perry that appellant's last known address was a Budget Suites motel in Lewisville.

Ellis received a telephone call from appellant while he was being interviewed by Perry. Perry asked Ellis to set up a meeting with appellant at Ellis's mother's house in Farmer's Branch. Appellant was arrested on the street where Ellis's mother lived. Brent Gibson, at that time a Richardson Police Department detective, testified that when police officers searched Ellis's mother's house—they had a search warrant and entered with her consent—they found clothing matching that worn by Ellis during the robbery and an item (a vibrating sex toy) taken from the store during the robbery.

During his interview with Perry, appellant denied any involvement in the Zone D'Erotica robbery. Appellant admitted the individual in the surveillance video looked like him, but it was not him. He also told Perry that it looked like someone he knew named "Sleepy." But appellant provided no information on "Sleepy" and Perry could find no one by that name in the police

department's gang database.

Ellis had originally told Perry that appellant was at a Budget Suites motel in Lewisville, but officers soon learned Ellis was not sure of the motel's location. Following a "process of elimination," the officers looked at Budget Suites in the area and eventually discovered that the motel they were looking for was actually in "The Colony." A security guard at the Budget Suites recognized Tommy McClendon's photograph and told officers which room he was staying in. The officers notified Perry and conducted surveillance of the motel room, which was rented in McClendon's name, until they had an arrest warrant. When McClendon had rented the room, he listed appellant's wife, Misty Murray, as his emergency contact and described her relationship as "mom." After obtaining arrest and search warrants, the officers went to the room and found McClendon and Misty Murray inside. The officers' search of the motel room recovered a BB gun, clothing matching that worn by McClendon during the robbery, gloves and shoes similar to those worn by McClendon during the robbery, an identification card for appellant, another pair of shoes, pornographic videos, and sex toys.

Perry also testified that a ZTE Metro PCS cell phone was obtained from appellant at the time of his arrest. The phone was registered to Misty Murray. Images taken by the cell phone included a photograph of McClendon and appellant with appellant wearing an orange hat similar to an orange baseball cap worn by one of the suspects in the Zone D'Erotica surveillance footage. Other photos showed various tattoos on appellant, and there was a photo of appellant sitting on a couch at the Budget Suites motel.

Michael Bosillo, the custodian of records at Metro PCS, testified that he reviewed the records for the subscribers Eric Ellis and Misty Murray on their calls made on December 21, 2010. He said that the records showed cellular phone calls between Ellis's number and Murray's number throughout that day. One call made at 8:45:01 p.m. involved Ellis calling Murray's

–6–

phone using a cell tower near the offense location in Richardson. At 8:50:22 p.m., Murray called Ellis using the same cell tower (the call went to voicemail). At 8:50:35, Murray called Ellis via the same location. At 8:51:52 and 8:58:39 p.m., the Murray phone used the same cell tower. Subsequent calls showed that Ellis's phone moved from the cell tower near the offense location to one in the Farmers' Branch area, and then subsequently to a cell tower in The Colony.

Laura Fleming, a firearms examiner with the Southwestern Institute of Forensic Sciences (SWIFS), testified that the BB gun found by the Richardson police, a Daisy Power Line Model 15 XT, had warnings that it was not a toy and that misuse of the item could result in serious injury or death. Her testing showed the BB gun was in good working order. She also noted that it looked like a real firearm. Unlike some air guns that are sold on the market, it did not have an orange tip to indicate it was not a firearm. Flemings testified that the BB gun could cause serious injury or death and could be a deadly weapon, although "there are so many variables when it comes to air guns as to what can happen, but the potential is certainly there." On cross-examination, she acknowledged the BB gun was an air gun rather than a firearm.

Tommy McClendon testified for the State that, at the time of the robbery, he had been living with appellant and appellant's wife at the Budget Suites in The Colony for approximately three weeks. On the night of December 21, 2010, a girl named Cara picked up McClendon and appellant at the motel and drove them to Farmer's Branch, where they picked up Ellis. They drove around "looking for someone to rob." McClendon testified that he was wearing a black hoodie with "gold designs on it," blue jean shorts, and (so he would leave no fingerprints) black gloves. Ellis wore a black hoodie with white lettering on it. Appellant was wearing "a burnt orange Texas hat with a 'T' on it," a striped polo shirt, a black jacket, and jeans.

When they arrived at the Zone D'Erotica, McClendon went into the store with Ellis to look around, pretending to be customers. They saw an employee and two customers. Ellis

called appellant on his cell phone. Appellant entered the store and walked around, acting like a customer. McClendon engaged the cashier in conversation about sexual toys and went with her into the rear or "caged" part of the store to look at merchandise. He returned to the counter as if he was going to buy the items he selected. Meanwhile, appellant, who was still walking around the store, passed by McClendon and asked him what he was waiting for. With the cashier behind the counter, McClendon jumped over the counter, grabbed the back of the cashier's shirt, and told her to open the cash register. He took money from the register and the cashier's purse. While this was going on, Ellis and appellant approached the two customers in the store and took items from them.

The three men took the employee and two customers into a back office of the store and ordered them to lay down on the floor. Appellant kept an eye on them while McClendon tried, unsuccessfully, to remove the unit that contained the store's video surveillance system. McClendon testified that he did not know appellant had a handgun and never saw him with a gun during the robbery, but had seen him with a BB gun two or three days earlier at the Budget Suites motel. McClendon testified that they took pornographic DVDs and "toys" from the store. Afterwards, they returned to Ellis's mother's house in Farmer's Branch and divided the items and the money.

McClendon, twenty years old at the time of trial, told the jury he had pleaded guilty to the three offenses in this case and, if he testified truthfully, would receive a sentence of eight years' imprisonment. He testified that he had been incarcerated as a juvenile following a November 2007 conviction for aggravated sexual assault of a child, and that in October 2009 he was convicted of criminal mischief and served a one-year sentence in state jail. McClendon said he did not know anyone named "Sleepy." He identified four handwritten letters (State's exhibits 86, 87, 88, and 89) he had received that were written and signed by appellant. McClendon

–8–

testified that, in those letters, appellant professed his innocence and asked for McClendon's help in clearing his name. Appellant told McClendon to contact appellant's attorney and investigator and tell them he would testify in court that "Sleepy" was the person seen in the video. McClendon admitted he wrote to appellant indicating he was willing to "take the rap" for appellant, but he did that only because appellant "kept on pressuring" him, and that he was intimidated by or scared of appellant. McClendon testified that appellant masterminded the robbery and was the one calling the shots. McClendon said on cross-examination that he did not recall telling the police "[t]here is no mastermind." On redirect, he clarified that he did not realize until later appellant had a gun during the robbery. He testified further that in the second of the four letters, exhibit 87, appellant told him what he wanted him to write.

Eric Ellis testified that he was at his mother's house on December 21, 2010, when appellant called him and asked him if he "was ready to go make some money," which meant rob a store. Appellant, McClendon (Ellis knew him as "White Chocolate"), and a woman whose name Ellis did not know picked up Ellis at his mother's house in Farmer's Branch. They left his mother's house and drove through North Dallas, eventually ending up in Richardson. Ellis believed appellant may have chosen the Zone D'Erotica store at random: "It was just, we were just driving around and it was a random place that was picked." But Ellis acknowledged that the store's convenient location, which provided easy access to the nearby service road, was also a factor.

At the Zone D'Erotica, Ellis and McClendon went inside the store and reconnoitered it, pretending to be customers. As they waited for the customers to leave, appellant called Ellis's cell phone and asked him "how it looked." Ellis told appellant there were two customers in the store and suggested they wait for the customers to leave, but appellant ignored Ellis's advice and entered the store "shortly after" that. The next thing Ellis recalled was McClendon jumping over

the counter and appellant pointing to the female customer and telling Ellis, "Get her." Ellis removed some money from the woman's purse while appellant took the male customer's wallet and phone. McClendon took the cashier's purse. Ellis testified he was not carrying a weapon during the offense and that he covered his hands with his sweatshirt in order to avoid leaving fingerprints. He said that he saw appellant with a gun inside the store after McClendon jumped over the counter, but did not know if the gun was real. He admitted previously telling the prosecutor that he had not seen the gun, but stated that he now remembered seeing it "[b]ecause a sufficient amount of time has passed that small details are flashing back into my memory."[1]

Appellant and McClendon took the cashier and the two customers into the back office. Ellis said he did not know what happened in the back office because he was not present. He was the first one to leave the store because he "was spooked" and he "was not used to this situation with taking hostages and having these. . . people involved in this crime . . . ." He saw appellant and McClendon grabbing some movies and other items on their way out of the store. After that, the three of them returned to Ellis's mother's house and divided up the money and other items. Ellis estimated his share of the "loot" was "somewhere around $200." He also got some of the other items, including the vibrating sex toy referenced earlier.

Ellis testified that he cooperated with the Richardson police after his arrest, telling them everything he had told the jury and identifying appellant as a participant in the robberies. He also arranged the meeting where appellant was arrested. Ellis acknowledged he had a prior state jail felony conviction for credit card abuse and was twice convicted of possession of a controlled substance. He also admitted that, at the time of his arrest, he had a sticker on a mirror in his bedroom that said "licks and tricks," and explained that a "lick" is either a robbery or "some kind of hustle," and a "trick" is a prostitute. He added that those words were displayed on his mirror

_____

[1] At the time Ellis testified, two years and nineteen days had passed since the offenses occurred.

because he was once proud of the life he led, but was no longer proud of it. He testified that he had not yet entered pleas to the charges against him but the prosecutor indicated she would consider recommending probation if he testified truthfully.

Ellis identified six letters he received from appellant while incarcerated. Ellis explained that, in those letters, appellant asked him "to take the fall for this case or to give over Sleepy, who is the real culprit." When asked who Sleepy was, appellant replied, "I do not know." He also testified that one of the letters he received (State's exhibit 85) made threats against his mother. That letter included a photocopy of Ellis's mug shot, above which was printed the words, "stop-snitching," followed by his jail book-in number and date of birth. Next to that was Ellis's mother's name, her Farmer's Branch address (which was also Ellis's address), her date of birth, and her driver's license number. The letter said, among other things, "Take your licks . . . stop-snitching," that Ellis was "the KEY State's witness against me," and concluded: "[H]ere's the paperwork proof he fucked over me and has made a deal to testify and lie on me[.] [T]his is a picture of him[,] so put it out there . . . ." On cross-examination, however, Ellis acknowledged that the letter threatening his mother did not come in an envelope and did not have appellant's return address on it. Ellis assumed appellant wrote it. Ellis also testified that appellant had been a mentor and looked out for him, and that he once saved Ellis's life. Ellis did not recall telling the police there was no mastermind. In addition, defense counsel pointed out that Ellis's life was "on the line" and asked, "You are going to do what you've got to do, right?" Ellis replied, "Yes."

After the State rested its case, the defense presented testimony from two witnesses: Jill Cramer, a forensic DNA analyst at Orchid CellMark, and Dr. Charles Weaver, III, a professor of psychology and neuroscience at Baylor University. Cramer testified that she performed "touch DNA" testing on specimens received from the Richardson Police Department. She compared a

–11–

swab taken from the exterior door handle at the offense location with a swab collected from appellant. The door handle sample contained a mixture of at least two individuals, including at least one male, and appellant was excluded as a possible contributor of DNA to the sample. She acknowledged, however, that DNA test results did not prove appellant did not touch the door handle because the DNA could have been knocked off of or wiped from the surface area tested.

Weaver testified that he is memory researcher who has done research on eyewitness testimony as it relates to criminal cases. He discussed various factors that can influence eyewitness testimony, such as stress, and testified that stress has a "very counter-intuitive effect on memory," i.e. "[a] little bit of stress improves your memory" "[b]ut too much stress, fear, anxiety, narrows your attention and actually impairs memory." He described an effect known as "the weapon focus" that applies when "a crime is committed with a weapon present" and "your "attention is naturally drawn to the weapon . . . at the expense of your memory for everything else." Weaver testified that, in a photographic lineup, "what you want is for people to make an instant, almost unconscious identification," and that "[p]eople can make comparative judgments . . . and still come to the right answer," but such a lineup is more likely to produce unreliable results. He added that the episode in this case was "fairly brief," that "several of the witnesses saw only in the periphery where our vision is considerably less acute," and that this "was done in the presence of a weapon," which elevates a person's fear. The comments made by witnesses in this case, such as "the eyes jumped out at me" or "I will never forget that nose," indicated they used "comparative analysis" rather than making a "quick holistic statement." Weaver addressed cross-racial identifications, noting that individuals "are about 50 percent less likely to make correct identifications and 50 percent more likely to make false alarms to opposite race suspects." He also noted that "[m]emories decline with the passage of time unless something intervenes to stop that."

At the conclusion of the testimony and arguments of counsel, the jury found appellant guilty in all three aggravated robbery cases. Appellant pleaded not true to the two enhancement paragraphs that alleged prior felony convictions for (1) possession of a controlled substance with intent to deliver over four grams and (2) aggravated robbery. The State subsequently presented punishment evidence. The jury found the enhancement paragraphs true and imposed a punishment of fifty-five years' imprisonment in each case. The trial court ordered the sentences to run concurrently. Appellant filed a motion for new trial alleging ineffective assistance of counsel. The trial court held a hearing on the motion and, after hearing evidence, denied it. This appeal followed.

DISCUSSION

1. Ineffective Assistance of Counsel

In his first five issues, appellant argues he received ineffective assistance of counsel during the trial of this case and during the punishment phase. Specifically, appellant contends: (1) trial counsel failed to object to inadmissible extraneous offense evidence during punishment; (2) he left a "discovery packet" with a jailer; (3) there was a "personal vendetta" between defense counsel and the lead prosecutor that impacted appellant's defense; (4) defense co-counsel left the trial during the presentation of evidence for no reason; and (5) defense counsel did not present evidence that was material to appellant's defense.

To be entitled to a new trial based on ineffective assistance of counsel, an appellant must show by a preponderance of the evidence that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Ex parte Lane*, 303 S.W.3d 702, 707 (Tex. Crim. App. 2009). The first prong requires the appellant to show counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–88; *Lane*, 303 S.W.3d at 707. The second

prong requires the appellant to show there is a reasonable probability that, but for his counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687, 694; *Lane*, 303 S.W.3d at 707. An appellant's failure to satisfy one prong negates a court's need to consider the other prong. *Strickland*, 466 U.S. at 697; *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

In determining whether an appellant has met his burden, we consider the totality of representation and the particular circumstances of each case. *Lane*, 303 S.W.3d at 707. We strongly presume counsel's conduct fell within the wide range of reasonable professional assistance, and we do not judge counsel's actions in hindsight. *Strickland*, 466 U.S. at 689; *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The fact that another attorney might have pursued a different strategy at trial is not sufficient to prove counsel was ineffective. *Scheanette v. State*, 144 S.W.3d 503, 509 (Tex. Crim. App. 2004).

The general rule is that a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of effective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003). In this case, however, appellant filed a motion for new trial. The trial court subsequently held a hearing on appellant's ineffective assistance claims. Because a hearing was held at which appellant presented evidence supporting his claim for ineffective assistance of counsel claim, we construe his issues as challenges to the trial court's ruling on the motion for new trial. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004), *superseded by rule on other grounds, State v. Herndon*, 215 S.W.3d 901 (Tex. Crim. App. 2007); *Shanklin v. State*, 190 S.W.3d 154, 158 (Tex. App.—Houston [1st Dist.] 2005), *pet. dism'd*, 211 S.W.3d 315 (Tex. Crim. App. 2007).

Under these circumstances, we review the *Strickland* analysis through an abuse of discretion standard of review, and we will reverse only if the trial court's decision is arbitrary or

unreasonable, viewing the evidence in the light most favorable to the ruling. *My Thi Tieu v. State*, 299 S.W.3d 216, 223 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd); *Shanklin*, 190 S.W.3d at 158–59. We afford almost total deference to the trial court's determination of the historical facts and of mixed questions of law and fact that turn on the credibility and demeanor of the witnesses. *Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999). The trial court was the sole judge of the witnesses' credibility, and a trial court does not abuse its discretion by denying a motion for new trial based on conflicting evidence. *See Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995).

### *Extraneous Offenses*

In his first issue, appellant contends trial counsel was ineffective because he failed to object to inadmissible extraneous-offense evidence that was admitted during the punishment phase of the trial.

During the punishment phase of the trial, Detective Perry read aloud from State's exhibit 214, a redacted copy of an admitted-for-record-purposes-only exhibit, State's exhibit 213, which was a Texas Department of Criminal Justice offense report regarding appellant. The prosecutor asked Perry to read aloud the paragraph marked "aggravated robbery" on page 75 of the record. Perry read the following to the jury:

> According to a Corsicana Police Department offense report on 5/9/94, in Corsicana, Texas, during the daytime hours, inmate Murray assaulted an 82-year-old white female by running up behind her and pushing her to the ground. The report indicated that inmate Murray then stole the victim's purse, containing approximately $30, and then fled the scene on foot.

> The report indicates that the victim, Elizabeth Gaiter (phonetic) sustained a fractured hip as a result of this robbery. The injury required open surgical repair and resulted in a three-week hospital stay. Her medical expenses were in excess of $21,000, with future bills expected. Inmate Murray claimed that he was arrested on 7/25/95, by Corsicana police without incident.

At that point, the trial court broke for lunch. After the recess, the trial court asked defense

counsel if he had any objections. The record reads as follows:

> THE COURT: Please be seated. [Defense counsel], do you have an objection?
>
> [DEFENSE COUNSEL]: Yes, Judge. I would like to object to the last evidence proffered from the witness stand, the evidence that the witness read. I would object on the grounds of hearsay and confrontation, of state and federal.
>
> THE COURT: Sustained.
>
> [PROSECUTOR]: Your Honor—
>
> [DEFENSE COUNSEL]: I would move for an instruction to the jury to disregard.
>
> THE COURT: All right. Ladies and gentlemen, occasionally from time to time in a trial, evidence is brought before you which should not be brought before you. That happened in this case with the last bit of evidence that this detective was reading from State's Exhibit No. 215 [sic]. I am instructing you not to consider that for any purpose. I have sustained the objection that it was hearsay and it's not subject to confrontation. In the most strongest terms possible, I'm instructing you to not consider that for any purpose in any sentence that you eventually assess. Anything else, Counsel?
>
> [DEFENSE COUNSEL]: I move for a mistrial at this time.
>
> THE COURT: Denied. State?
>
> [PROSECUTOR]: Well, Your Honor, at this time the State will then go ahead and withdraw State's Exhibits Nos. 214, 215, and 213.
>
> THE COURT: That evidence will be withdrawn. It is not before the jury for consideration. . . .

When he testified at the hearing on his motion for new trial, appellant said it seemed as though counsel "bowed down" to the prosecutor and "just gave up." He also faulted trial counsel for not objecting sooner when Perry "just started reading from [my] past." At that same hearing, defense counsel testified that he objected to the extraneous punishment evidence and, when that objection was sustained, successfully sought an instruction to disregard and then requested a mistrial, which the trial court denied. He further explained that, during the recess that preceded the defense's objection, defense counsel, the State and the trial court met and "talked about what had happened." Counsel testified: "I told them at the time that I had not objected as I would

–16–

have liked to but I did intend to object, and if we went back on the record I would object. When we got back on the record, that's exactly what I did." He acknowledged that he "let too much time go" and "would like to have objected faster looking back on it," but stated he "had my reasons at the time as to why I didn't jump up in the middle of testimony but it is what it is."

The record shows that defense counsel did object to the testimony in question. The trial court sustained counsel's objection and instructed the jury to disregard the testimony. Instructions to the jury are generally considered sufficient to cure improprieties that occur during the trial. *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009). We generally presume the jury will follow the trial court's instructions. *Id.* Counsel acknowledged that he "would like to have objected sooner looking back on it," but "had my reasons at the time." A decision not to object to inadmissible evidence may be the result of sound trial strategy. *Darby v. State*, 922 S.W.2d 614, 624 (Tex. App.—Fort Worth 1996, pet. ref'd). Moreover, an isolated failure to object to improper evidence does not constitute ineffective assistance of counsel. *See Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). We conclude appellant has failed to show defense counsel's actions fell outside the range of reasonable professional assistance.

### *Discovery Packet*

In his second issue, appellant contends defense counsel left a discovery packet turned over by the State with a jailer who went through the entire discovery packet before delivering it to appellant several hours later.

Appellant testified at the motion for new trial hearing that counsel just left the discovery packet, which appellant claimed was subject to "lawyer/client confidentiality," with the jailer, B. Brown, who "went through my package for two hours and then brought it to me." Appellant also alleged that it was not until the following week that he received a letter from defense counsel informing him that he had left the discovery packet with the jailer to give to appellant. Defense

–17–

counsel offered the following explanation of the situation regarding the discovery packet:

> First, [appellant] talked about the discovery. He complained that I tendered his discovery packet to the sheriff and that a potential State's witness in the case, jailer B. Brown, was able to get his hands on that discovery and review it before finally giving it to him.
>
> On that day—first off, Mr. Brown—[appellant] had told me previously that jailer Brown had made contact with him and had given him a hard time about the case before the discovery was tendered. I notified the State that a potential State's witness was having contact with my client in the jail and both the State and I, [the prosecutor], agreed that we should ask the sheriff's department to transfer [appellant] away from jailer Brown or transfer Jailer [sic] Brown away from [appellant]. At the time I was finally able to tender discovery to [appellant] I was under the impression, based upon what the sheriff told me, that jailer Brown and [appellant] had no contact at all at that point. At the time I took the discovery it was just what had been tendered to me by the State, which is police reports, et cetera. There was no confidential communication, there was no attorney work product, there were no letters from me. It was all State's documentary evidence.
>
> I went to wait for [appellant]. As is customary procedure, the sheriff deputy there on duty asked me if I had anything for [appellant] to sign. The importance of that is, if you have something for them to sign, they will unlock the window and pass it over directly to [appellant] or the defendant and have him sign it and return it. I stated, no, I did not have anything for him to sign and so the customary procedure is for you to hand whatever documents you have to the deputy there behind the glass. I asked to hold onto the discovery and wait for [appellant] to go over it in person. I waited approximately 30 to 45 minutes. I had a hearing coming up and did not have time to wait any further. I finally gave it to the deputy, which was customary procedure. So I had no way of knowing that jailer B. Brown was going to get his discovery. And, for the record, the person I gave it to was not B. Brown. That was the first thing he alleged.

Although appellant testified that the entire contents of the discovery packet were subject to "lawyer/client confidentiality," defense counsel testified that the packet did not contain *any* confidential communications or attorney-client work product, and that he followed customary jail practices in delivering the packet to appellant. We conclude appellant failed to show defense counsel's actions regarding the discovery packet fell outside the range of reasonable professional assistance.

### *"Personal Vendetta"*

In his third issue, appellant alleges there was a "personal vendetta" between defense

counsel and the lead prosecutor because they had once been involved in a "romantic relationship," and that appellant suffered harm because of this prior relationship.

Appellant alleged in his motion for new trial and testified at the motion for new trial hearing that defense counsel and the lead prosecutor had a romantic relationship, which he characterized in the affidavit attached to his motion for new trial as a "law school love affair." He testified that the "past personal relationship" and "personal vendetta" between defense counsel and the lead prosecutor "affected me in a major way because the personal thing they had she took it towards me and sought me out with a vengeance." Defense counsel testified that he had told appellant that he attended law school with the lead prosecutor, "but the rest of this whole story about a personal relationship, about a sexual relationship, about a vendetta, all of that is false, absolutely false." He admitted telling appellant that he thought the prosecutor was taking the case personally, but denied using any derogatory words to describe her. Defense counsel also testified that, while he disagreed with the prosecutor's outlook on the case, he thought she handled the case professionally. The State introduced an affidavit from the prosecutor that reads in part as follows:

> [Appellant] has made claims that he believes there to be a "personal vendetta" between [defense counsel] and myself and that we had a "law school love affair." [Defense counsel] and I have known each other from law school and in fact, I was friends with his wife when we were in school together. What [appellant] has claimed is completely bogus and has no foundation. In fact, [appellant] brought this issue before Judge Mitchell in a pretrial hearing in December 2012[2] and asked for new counsel. Judge Mitchell addressed this issue on the record that he did not believe there to be any issues between myself and [defense counsel] after [appellant] made this assertion to the Court. Judge also indicated there was no conflict of interest between [defense counsel] and myself. [Appellant] stated that the [defense counsel] told him personal things about me, including that I have children and that "I feared for their safety." I can assure the Court that I have no children nor did I have any safety concerns from [appellant].
>
> Additionally, [appellant] asserts that I harbored "ill will" toward him and made an

---

[2] The reporter's record in these appeals does not include a December 2012 pretrial hearing.

"extra effort to prosecute" [appellant]. I put forth the effort that was necessary to prosecute this case, which included poring [sic] over hundreds of pages of discovery, listening to over 30 hours of recorded jail calls, watching hours of interview videos, interviewing many witnesses, researching case law, and preparation for punishment. I did my job and there was most certainly no personal vendetta toward [appellant] or the Defense.

Both defense counsel and the lead prosecutor testified that appellant's allegations of a "personal vendetta" between them, or some sort of past romantic relationship, were absolutely false. Appellant has failed to show defense counsel's actions fell outside the range of reasonable professional assistance. Defense counsel cannot be judged ineffective based on unsubstantiated and unsupported allegations. Consequently, we conclude the allegation of deficient performance is without merit.

### *Absence of Defense Co-Counsel During the Trial*

In his fourth issue, appellant argues he received ineffective assistance of counsel because one of his attorneys left the trial during the presentation of evidence. In his motion for new trial affidavit, appellant alleged that defense co-counsel "received a call of importance and had to pull out of the trial which also left [appellant] improperly represented due to half of [his] lawyers['] team being absent." Appellant, however, does not specify when this absence occurred or how long co-counsel was absent from the courtroom. Nor does he allege that lead counsel was absent during any particular portion of the trial. We also note that appellant has failed to cite any legal authority in support of this issue and he does not address how trial counsel's performance or lack thereof prejudiced his defense. *See* TEX. R. APP. P. 38.1(i). We conclude appellant has again failed to show defense counsel's actions fell outside the range of reasonable professional assistance.

### *Failure to Present Evidence*

In his fifth issue, appellant contends defense counsel was ineffective because he failed to present evidence that appellant asked him to present, i.e., letters from the accomplices, the fact

that Ellis was a heroin dealer, testimony from appellant's wife, Misty Murray, testimony from a fellow inmate, Temontray Minafee, appellant's medical records, and the fact that the ID card found at the motel was actually a "Texas prison ID," not a standard Texas identification card.

### *Letters from McClendon and Ellis*

Appellant testified at the motion for new trial hearing that he gave defense counsel letters that McClendon and Ellis had written to him and that defense counsel "spoke on the letters" during trial, but never offered them into evidence. "He just asked them did they write them." Appellant argues that the letters would have shown he did not commit the offense. Defense counsel, however, testified that he used the letters in his cross-examination of both co-defendants and that, while appellant complained about counsel's failure to offer the letters into evidence, rule 613(a) of the Texas Rules of Evidence prohibited him from doing so. *See* TEX. R. EVID. 613(a) (governing examination of witnesses concerning prior inconsistent statements and prohibiting admission of extrinsic evidence of a prior inconsistent statement that a witness unequivocally admits). Trial counsel cannot be judged ineffective for failing to offer inadmissible evidence. *Coleman v. State*, 188 S.W.3d 708, 724–25 (Tex. App.—Tyler 2005, pet. ref'd); *Smith v. State*, No. 14–94–00452–CR, 1996 WL 224985, at *5 (Tex. App.—Houston [14th Dist.] May 2, 1996, pet. ref'd) (not designated for publication).

### *Ariel Woods*

Appellant also argues that in cross-examining Ariel Woods—who testified that she rode with a friend to pick up appellant from the Budget Suites motel in The Colony at around 10:30 p.m. on December 29, 2010, and then drove him to a house in Farmer's Branch, where they were subsequently pulled over by the police and arrested—defense counsel should have brought out the fact that Ellis was a heroin dealer. Defense counsel testified at the motion for new trial hearing that appellant told him that when he and Ariel Woods were headed to Ellis's house, "he

was on the way over there to do a drug deal." Defense counsel testified that he explained to appellant that, prior to trial, he had filed a motion in limine requesting the State not be allowed "go into this," and that this was a defensive strategy because he did not want the jury to "convict [appellant] for being a criminal generally." We conclude appellant has again failed to show counsel's actions fell outside the range of reasonable professional assistance.

### *Misty Murray and Temontray Minafee*

Appellant argues counsel was ineffective for failing to call his wife, Misty Murray, and an individual who shared a jail cell with McClendon, Temontray Minafee, as witnesses. Beginning with appellant's wife, appellant testified at the motion for new trial hearing that he asked defense counsel to call Misty as a witness during the guilt-innocence portion of the trial. Appellant alleged that her testimony would have shown he was not staying at the Budget Suites motel, that none of the items found in the room belonged to him, and that the cell phone belonged to her. Regarding Minafee, appellant testified that Minafee had written appellant letters indicating he had information "[a]bout what happened with the robberies and how I had nothing to do with it," and that the State was offering McClendon "a plea bargain to lie on me." Appellant testified that he asked defense counsel to call both individuals as witnesses.

In her affidavit, the prosecutor stated that appellant had been indicted on a charge of witness tampering based on a series of telephone calls he had in the jail with Misty "coordinating how she would testify on behalf of [appellant]." The prosecutor explained that the State intended to use the jail telephone calls, which were made from appellant's jail "pin" and the pins of several other inmates, to show how appellant "concocted details how he wanted Mrs. Murray to testify to under oath at [appellant's] trial," and "that the plan was for her to lie on the stand at [appellant's] behest." Because Misty was not called to testify, the telephone calls were not used during the guilt-innocence part of the trial.

Defense counsel testified that Misty "was a central figure in our defense strategy from the very beginning." But after counsel learned about the jail telephone calls and the allegations of witness tampering in June 2012, he told appellant that calling Misty as a witness would open the door to the use of the telephone calls, which included "allegations of extraneous criminal conduct," put appellant's wife at risk of perjury charges, and "that it would be best to limit the jury's hearing of extraneous offenses." Defense counsel testified that appellant agreed with this strategy, but changed his mind several months later and told defense counsel in November 2012 "that he absolutely wanted Misty to testify, that she was central to his defense, and he was not worried about her getting a perjury charge." In December 2012, however, appellant told defense counsel "that Misty was, quote, gone. She would not be testifying. That she, quote, knew to stay away." Defense counsel added that he "put all of those quotes in my notes because I thought they might be important later." Based on appellant's statements, defense counsel did not believe appellant wanted to call Misty Murray as a witness "and that he understood the nature of what could happen to him if Misty testified."

As for Temontray Minafee, defense counsel testified he "had never gotten that name" from appellant and that it did not appear anywhere in his notes or his investigator's file. Counsel recalled appellant talking about McClendon's cellmates "and how they could corroborate the letters that [McClendon] had written." But counsel "did not know about cellmates previously." Counsel thought appellant's main concern was for the letters appellant received from McClendon and Ellis to be heard by the jury, "[s]o we agreed that that was the most powerful evidence directly out of a horse's mouth and calling other people to back up evidence that we already had would be counter-productive, not counter-productive, but unnecessary."

Given the testimony of the prosecutor and defense counsel regarding the witness tampering charge pending against appellant, and the risk to Misty Murray of a perjury charge if

she testified on appellant's behalf, appellant has not shown that defense counsel's decision not to call her as a witness was not based on sound trial strategy. Furthermore, while appellant alleged Minafee wrote him letters saying that McClendon admitted appellant had nothing to do with the offense, and that he was lying to get a plea deal from the State, appellant did not produce those letters. Defense counsel denied even knowing Minafee's name prior to the motion for new trial hearing, and he explained his trial strategy of relying on his cross-examination of McClendon and Ellis. Appellant has failed to show defense counsel's actions fell outside the range of reasonable professional assistance.

### *Medical Records*

Appellant also argues defense counsel was ineffective because he failed to introduce into evidence medical records from the Richardson Methodist Memorial Hospital for injuries appellant allegedly sustained after Detective Perry allegedly "stomped" and "kicked" appellant in an effort to force him to sign a confession. Defense counsel testified that he had reviewed the medical records, which appellant's counsel introduced at the motion for new trial hearing, and that they showed appellant reported blood in his urine. The hospital, however, did not find any blood in appellant's urine when they analyzed it, and defense counsel concluded the medical records "failed to document any sorts of injuries, any sorts of trauma," and that the records indicated appellant "was released in stable condition." Defense counsel also noted that his investigator's subpoena for additional medical records did not yield any further medical records regarding appellant's stay at the Richardson hospital, and that they simply "didn't have anything to use there." We conclude appellant has failed to overcome the presumption of reasonable professional assistance.

### *Appellant's ID Card*

Appellant's final ineffective assistance argument is that defense counsel should have

introduced evidence that the ID card found at the Budget Suites motel bearing appellant's name was actually a "Texas prison ID," and that it was found in his wife's purse. Appellant testified that the trial testimony "made it sound like as if it was [his] Texas ID up in the room, a Texas state issued from the DMV and it wasn't." Defense counsel testified that he and his co-counsel discussed this matter at length and decided they should try to prevent the jury from hearing that the ID card was a "TDC card" because that would have told them appellant had previously been convicted of a felony. We conclude appellant has again failed to overcome the presumption of reasonable professional assistance.

### *Conclusion*

Because appellant has failed to overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance, he has not satisfied the first prong of the *Strickland* analysis regarding any of his allegations of ineffective assistance. Accordingly, the trial court did not abuse its discretion by denying appellant's motion for new trial based on ineffective assistance of counsel. We overrule appellant's first, second, third, fourth, and fifth issues.

### 2. Challenges for Cause

In his sixth, seventh, and eighth issues, appellant contends the trial court abused its discretion by denying his challenges for cause to prospective jurors Erol Arkan, Linda, Whitworth, and Michael Golubski.

The first issue is whether the trial court's rulings on appellant's challenges for cause harmed him by effectively depriving him of one of his statutorily allotted peremptory challenges. *See Newbury v. State*, 135 S.W.3d 22, 30–31 (Tex. Crim. App. 2004); *Johnson v. State*, 43 S.W.3d 1, 6 (Tex. Crim. App. 2001). Harm from an erroneous denial of a defense challenge for cause focuses on whether a peremptory challenge "was wrongfully taken from" the defendant.

*Johnson*, 43 S.W.3d at 6. Such harm occurs "(1) when a defendant exercises a peremptory challenge on a veniremember whom the trial court should have excused for cause at the defendant's request, (2) the defendant uses all of his statutorily allotted peremptory challenges, and (3) the defendant unsuccessfully requests an additional peremptory challenge which he claims he would use on another veniremember whom the defendant identifies as 'objectionable' and who sits on the jury." *Newbury*, 135 S.W.3d at 31. When these conditions are met, the trial court's erroneous denial of a defense challenge for cause harms the defendant by effectively depriving him of one of his statutory peremptory challenges because "he had to use a peremptory challenge to remove a veniremember who should have been removed for cause." *Id.*

At trial, defense counsel unsuccessfully challenged prospective jurors Arkan (4), Amber Eumana-Vasquez (5), Whitworth (10), and Golubski (53) for cause. The trial court denied his request for additional peremptory strikes. Defense counsel argued that, because of the denial of the challenges for cause to prospective jurors 4, 5, 10, and 53, and the denial of his request for additional peremptory strikes, the defense was forced to use peremptory strikes on panelists who should have been removed for cause. Counsel stated that, as a result, two individuals, Casey Burton and Walker Hargrove, served on the jury when the defense would have used peremptory challenges on them. Appellant has thus satisfied the requirements to show harm because he used his allotted peremptory challenges and was denied additional peremptory challenges to prevent two other "objectionable" jurors, Burton and Hargrove, from sitting on the jury during trial. As a result, the issue becomes whether the trial court erroneously failed to excuse Arkan, Whitworth, and Golubski for cause.

"A challenge for cause is an objection made to a particular juror, alleging some fact which renders the juror incapable or unfit to serve on the jury." TEX. CODE CRIM. PROC. ANN. art. 35.16(a). A venireperson is challengeable for cause if he or she has a bias or prejudice in

favor of or against the defendant or against the law upon which either the State or the defense is entitled to rely. *Id*. art. 35.16(a)(9), (b)(3) & (c)(2); *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009). "The test is whether the bias or prejudice would substantially impair the prospective juror's ability to carry out his oath and instructions in accordance with law." *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002). Before a prospective juror can be excused for cause on this basis, the law must be explained to him and he must be asked whether he can follow that law regardless of his personal views. *Jones v. State*, 982 S.W.2d 386, 390 (Tex. Crim. App. 1998). The proponent of a challenge for cause has the burden of establishing his challenge is proper. *Feldman*, 71 S.W.3d at 747. To establish that the challenge for cause is proper, the proponent of the challenge must show the venireperson understood the requirement of the law and could not overcome his prejudice well enough to follow it. *Id*.

We look at the entire voir dire record to determine if the evidence is sufficient to support the trial court's ruling on a challenge for cause. *See Gonzales v. State*, 353 S.W.3d 826, 831 (Tex. Crim. App. 2011). We afford great deference to the trial court's decision because the trial judge was present to observe the demeanor of the veniremember and to listen to the tone of his or her voice. *Id*. "Particular deference is due when the venireperson's answers are 'vacillating, unclear, or contradictory.'" *Id*. (quoting *Davis v. State*, 313 S.W.3d 317, 344 (Tex. Crim. App. 2010)). We will reverse a trial court's ruling on a challenge for cause only if a clear abuse of discretion is evident. *See Davis*, 313 S.W.3d at 344.

### *Arkan*

Defense counsel made three challenges for cause against Arkan, which the trial court denied. Appellant argues Arkan was biased as a matter of law because he admitted that he could not be impartial when there was violence or a weapon involved in the offense, and because of his beliefs regarding the presumption of innocence and the burden of proof.

–27–

When examined by the prosecutor, Arkan stated that he was "really sensitive towards" "any kind of assault" or "physical violence," and that he "really hate[d] the gun culture." The State asked Arkan whether he could set aside his beliefs on guns and violence and listen to the evidence. Arkan replied: "I mean, would I be able to? I'm sure I could find a way, but it would be difficult." When examined by defense counsel, he stated that he thought there was "some level of guilt" in bringing a weapon "into a situation like this." He also told defense counsel that he understood the police report, the arrest, and the indictment were not evidence of guilt, "but it's essentially impossible for me to just pretend like that doesn't exist." When the defense challenged Arkan for cause, the trial court explained the grand jury process to the prospective juror and that "innocent people do get indicted." The court asked, "So with that explanation of the law, can you, as I will instruct you, not consider the indictment as any evidence of guilt and look instead to the testimony in the trial to determine issues of guilt and innocence?" Arkan said, "I would be able to, yes." The trial court denied the challenge for cause.

Shortly thereafter, defense counsel asked Arkan if he would be more likely to find the defendant guilty if he did not testify or did not put on any evidence. Arkan replied: "I don't know that I can give a hundred percent answer to that. But, you know, it [sic] was asked about kind of the prejudices coming in and I'd be going into it feeling like that would be the case." When defense counsel again challenged Arkan for cause, the trial court explained the law to Arkan and asked him about his position. The relevant portion of the record reads as follows:

> THE COURT: Okay. Again, when I do the written instructions, I break down the elements of the offense in the instructions to the jury and I'll say, No. 1, did the defendant, say his name; No. 2, on such and such a date; No. 3, in Dallas County, Texas; No. 4, intentionally and knowingly do something. And I list them like that, eight or nine things.
>
> None of those things is a technicality. Those are the things that the State has to prove beyond a reasonable doubt. If the State doesn't prove one of those, if their story is incomplete, that goes against the State, not against the defendant, because they have the burden of proof, and they have to prove elements 1, 2, 3, 4, 5, 6. If

–28–

they don't prove any of those elements, I will instruct you to find the defendant not guilty.

So with that clarification, do you think you could require the State to prove the elements of the offense as I set them forth for you in the charge?

PROSPECTIVE JUROR: I think that using the word "required," it makes sense. Yes, I would be able to. I guess, personally, I struggle with that concept, though, because there's something about the way evidence was presented or brought to the Court that—or, you know, something that couldn't be used, some information couldn't be used, that I'd have to ignore that because of the way that, like you said.

THE COURT: Well, that's why I'm here.

PROSPECTIVE JUROR: Yeah, I understand.

THE COURT: I make sure that only relevant evidence is admitted before you and I've got rules of evidence that I go by. And the lawyers are bound by those rules, just like I am. So if it's admitted into evidence, I'm not telling you to believe it. I'm not telling you anything about it, other than the fact that it's admissible. If it's admissible, then it's relevant.

PROSPECTIVE JUROR: Right. I understand that. And I understand that that would be the job of the jury. That's difficult, but I understand that I would have to comply.

The trial court denied the second challenge for cause.

After the court denied his second challenge for cause against Arkan, defense counsel asked him whether it would violate his conscience to require the State to prove all of the elements of the offense. Arkan responded, in part:

And I understand the burden of proof and all that stuff, so I don't know that I would say it violates my conscience. It's just it's very difficult to not be prejudiced and biased in my thinking when, you know, when meeting with eleven other people.

Defense counsel asked him:

Okay. And the last question I have, can you be sure—okay, and listen to what I'm saying, can you be sure that you would be able to put that bias and prejudice away and follow the law as it's given to you by the Judge? Can you be sure that you would put the bias and prejudice away and get past it?

Arkan answered, "I cannot be sure." The defense again challenged Arkan for cause, which the

trial court denied.

Appellant argues Arkan was biased or prejudiced against the law on which the defense was entitled to rely and biased against appellant as a matter of law. The record shows Arkan gave hesitant or unclear answers, but told the trial court he could follow the law, adhere to the presumption of innocence, and hold the State to its burden of proof. Therefore, we defer to the trial court that was able to observe Arkan's demeanor and assess his capacity to serve as a juror in this case. Based on the totality of the voir dire testimony, the trial court did not clearly abuse its discretion by denying the defense's challenges for cause. *See Davis*, 313 S.W.3d at 344. We overrule appellant's sixth issue.

### *Whitworth*

Appellant also contends the trial court erred in overruling his challenge for cause to prospective juror Whitworth because she was predisposed to believe police officers. According to the record, Whitworth informed the parties that her son-in-law had been a police officer in Massachusetts and, in response to questioning from defense counsel, said that, knowing his "work ethic," she "would most likely lean to judge most police officers to be honest and very thorough in their work." She also said that she had never served on a jury, did not know what she would do, and did not know whether her son-in-law's status as a police officer would influence her decision. After further questioning by defense counsel, the trial court asked Whitworth:

> THE COURT:  Here's the test.  Are you telling me that if a police officer testifies, no matter what, you're going to believe that police officer over every other witness no matter what?

> PROSPECTIVE JUROR:  No, I don't think I can tell you that.  I would have to— it would depend on the merit and on what that person said.

Defense counsel further questioned Whitworth as follows:

> [DEFENSE COUNSEL]:  But you would start them off—or I guess, I think the

–30–

more fair way which you put it was, you can't be sure that you wouldn't start that officer off with more credibility, is what you're saying? You may not believe them every time over every other witness ever, but you're saying that you can't be sure that you wouldn't start them off as more credible; is that fair?

PROSPECTIVE JUROR: I—yes. I—I believe your statement. I do not think that I would walk in believing that just because they're a police officer, they're more credible or there [sic] less credible than any other person.

[DEFENSE COUNSEL]: Right. It's not absolute is what you're saying. You're not saying, I will always believe police officers no matter what, right? That's not what you're saying?

PROSPECTIVE JUROR: Well, no.

[DEFENSE COUNSEL]: What you're saying is that you can't be sure you wouldn't give him a bump up in credibility?

PROSPECTIVE JUROR: I'm not sure I wouldn't give them a bump up in credibility, that is correct.

[DEFENSE COUNSEL]: Okay. Thank you.

Appellant argues the trial court abused its discretion by denying the challenge for cause against Whitworth because she revealed a predisposition to believe police officers. The record, however, shows that Whitworth did not indicate a bias that would disqualify her as a juror. She stated that she would not believe a police officer over every other witnesses "no matter what," and that "it would depend on the merit and on what that person said." Based on the totality of the voir dire testimony, the trial court did not clearly abuse its discretion by denying appellant's challenge for cause. *See Davis*, 313 S.W.3d at 344. We overrule appellant's seventh issue.

### *Golubski*

When questioned by the State, Golubski, an engineer, stated, "I've heard of some cases where I thought the person was 100 percent guilty and due to a technicality they got off. I didn't like that." When the State explained that it must prove all of the elements of the offense and that "[t]here's not any technicalities here," Golubski at first stated he was "pretty sure" he could find a person not guilty if all of the elements were not established. After the State told him that

"[p]retty sure doesn't cut it," Golubski eventually stated that he would find appellant not guilty if the State failed to prove an element of the offense. Questioned further by the defense, he said that he was "99.992 percent sure" that he could follow the law. Finally, the trial court explained that after the evidence was submitted the court would instruct the jurors on what the State was required to prove and that "none of those things is a technicality. Every one of those things under the law has to be proven beyond a reasonable doubt." After offering several illustrations, the court further explained, in part:

> Take the word technicality out of your mind completely. If I instruct you the State has to prove ten elements beyond a reasonable doubt, whether you think they're important or not doesn't really matter. I think they're important and I know the law. So I'm telling you they're important. So the State proves all ten elements. Will you return a verdict of guilty?
>
> PROSPECTIVE JUROR: Yes.
>
> THE COURT: If the State does not prove any of these important matters, I'm telling you they're important, will you find the defendant not guilty?
>
> PROSPECTIVE JUROR: Based upon the way you said it, yes.
>
> THE COURT: There you go.

Appellant argues Golubski should have been excused because he was shown to be biased as a matter of law. The record, however, does not support this conclusion. Although Golubski vacillated in some of his responses, he ultimately stated that he could follow the law. As we stated earlier, we defer to the trial court that was able to observe Golubski's demeanor and assess his capacity to serve as a juror in this case. Based on the totality of the voir dire testimony, the trial court did not clearly abuse its discretion by denying the defense's challenge for cause. *See Davis*, 313 S.W.3d at 344. We overrule appellant's eighth issue.

### 3. Sufficiency of the Evidence

In his ninth issue, appellant argues the State failed to prove the use of a deadly weapon or his identity as the person who committed the offenses.

In reviewing a challenge to the sufficiency of the evidence, we examine all of the evidence in the light most favorable to the verdict and determine whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Lucio v. State*, 351 S.W.3d 878, 894–95 (Tex. Crim. App. 2011); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.). We must defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 326; *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008).

As alleged in the indictments, a person commits aggravated robbery if he "commits robbery" and "uses or exhibits a deadly weapon." TEX. PENAL CODE ANN. § 29.03(a)(2). A person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." *Id.* § 29.02. A person commits theft if he "unlawfully appropriates property with intent to deprive the owner of property." *Id.* § 31.03(a).

The Texas Penal Code defines a "deadly weapon" as "(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17). Expert or lay testimony may be sufficient to support a deadly weapon finding. *See Tucker v. State*, 274 S.W.3d 688, 691–92 (Tex. Crim. App. 2008); *English v. State*, 647 S.W.2d 667, 669 (Tex. Crim. App. 1983); *Wilson v. State*, 391 S.W.3d 131, 137 (Tex. App.—Texarkana 2012, no pet.).

A BB gun is not a deadly weapon per se. *Adame v. State*, 69 S.W.3d 581, 582 (Tex. Crim. App. 2002). In offenses involving a BB gun, the State must show "that the weapon used

was capable of causing serious bodily injury or death in its use or intended use." *Id.*; *see* TEX. PENAL CODE ANN. § 1.07(a)(17)(B). Whether a BB gun is loaded is not significant in a deadly weapon analysis; instead, what is significant is whether there is evidence presented that the BB gun is capable of causing serious bodily injury. *Adame*, 69 S.W.3d at 582. "With testimony that a BB gun is capable of causing serious bodily injury, it is reasonable for a jury to make a deadly weapon finding." *Id.*; *see also Williams v. State*, 240 S.W.3d 293, 299 (Tex. App.—Austin 2007, pet. ref'd).

Appellant does not dispute that there was a robbery. He does, however, argue that the BB gun used in the offenses was not a deadly weapon per se and that the surveillance video showed "[t]he BB gun was never pointed at anyone where it could have caused serious bodily injury or death." Appellant therefore "submits that this was not an aggravated robbery but rather a robbery." He also questions the evidence showing his identity as the person who was holding the gun by pointing to the lack of DNA linking him to the offenses and the absence of any testimony regarding his facial tattoos.

Neither argument is persuasive. Laura Fleming tested the BB gun and found it to be in good working condition. She testified that in her opinion it could cause serious bodily injury or death and that it could be deadly weapon. She also noted that the BB gun's operations manual warned it was not a toy and that the misuse or careless use of the item may cause serious injury or death. The testimony presented by the State provided information upon which the jury could reasonably find the BB gun was capable of causing serious bodily injury. *See Adame*, 69 S.W.3d at 582. The evidence also showed that the three complaining witnesses and two accomplices identified appellant as the black male perpetrator of the offenses. Other evidence, such as the surveillance video and the cell phone records, supported their identifications of appellant. Although Tuggle testified that she was only fifty percent certain of her identification of appellant

in the photographic lineup, other eyewitnesses expressed a greater level of confidence in their identifications. Tera Mitchell testified that she was "a hundred percent sure" of her identification of appellant as the black male perpetrator, and that she saw the black male holding a gun as she and the other two complaining witnesses were held in the back room of the Zone D'Erotica. All three complaining witnesses testified that they feared for their lives. It was the jury's role as the fact-finder to assess the credibility and demeanor of the witnesses and determine the weight of the evidence. *See Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). The same is true for Dr. Weaver's testimony regarding eyewitness identifications and Cramer's testimony that appellant was excluded from the DNA collected on the door handle. In addition, the jury was free to accept or reject any or all of the evidence presented by either side, and any or all of the testimony of any witness. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008); *Franklin v. State*, 193 S.W.3d 616, 620 (Tex. App.—Fort Worth 2006, no pet.). Viewing the evidence in this case in the light most favorable to the verdict, we conclude the evidence is sufficient to support the convictions for aggravated robbery. We overrule appellant's ninth issue.

### 4. Accomplices' Testimony

In his tenth issue, appellant argues the trial court abused its discretion by allowing McClendon and Ellis to testify after they violated the "Rule of Witnesses" by conferring in a holding cell during the trial, and that appellant was prejudiced as a result of the violation.

The trial court invoked "the Rule" shortly before the first witness testified, at the request of defense counsel. Subsequently, on the morning of the third day of the guilt-innocence portion of the trial, defense counsel told the trial court he wanted to put something on the record. He stated:

> This morning prior to getting started my client notified me, and the bailiffs confirmed, that the two co-defendants were brought up together this morning and that when the bailiffs found them this morning, they were together in holding cell No. 2, in the same cell, not separated. My client tells me that he could hear them

–35–

clearly and that they were going through their prospective testimony and discussing it this morning in the holdover cell.

I wanted to put that on the record and deal with it appropriately. I guess the same thing we did with the two complaining—the complaining witnesses earlier, bring them in here outside the presence of the jury before their testimony and see if that is correct. They are both on the witness list. I know [the prosecutor] has discussed with them that the Rule has been invoked and discussed what that means and if that is the case, then that would be a violation of the Rule and we would move for a mistrial.

The prosecutor told the trial court that she advised McClendon and Ellis "that they were not permitted to speak to anyone regarding these offenses, other than me and their defense attorney." She also stated that she had spoken with the court coordinator and the bailiffs that morning about keeping the two witnesses separated.

During a hearing held out of the jury's presence, Ellis testified that he and McClendon were taken to a "holdover" cell by sheriff's deputies in preparation for their court appearances. They were transported to court together, rode the elevator together, and were held in the holdover cell for approximately thirty minutes. Ellis testified that, in the holdover cell, they discussed "how [McClendon] had received some letters and some type of correspondence referring to the threat to his family." Ellis also asked McClendon "if he had any contact with his people, if he had anybody putting money on his books, or anything like that." Defense counsel asked Ellis if they talked about the fact that they were going to testify. Ellis replied: "We never said that we were going to testify. We—he asked if we were here because of [appellant], and I said I think so." Ellis stressed that they never used the word "testify," explaining, "We were both uncomfortable about the situation that we are in, so we didn't want to use—we didn't want to bring up the situation, anyways." On cross-examination, Ellis admitted he was aware that he was not permitted to talk to anyone about his testimony. He testified that he did not talk about how he would testify or the statements he would make as a witness when he spoke to McClendon, nor did McClendon talk about the statements he would make as a witness. They

–36–

did, however, talk about the letters they received from appellant.

McClendon testified that he was brought to court along with Ellis, rode the elevator with him, and spent "[l]ike 20 minutes" in the holdover with him. He said they "didn't talk about much" because it was "kind of uncomfortable." He admitted that he told Ellis about receiving letters from appellant that he considered threatening, and that Ellis said he received threatening letters from appellant. McClendon testified that he knew he should not discuss the case with anyone, but said he did not know the State was going to ask him questions about whether he felt threatened by appellant. He testified that he did not discuss his testimony or what happened at the Zone D'Erotica with Ellis. McClendon confirmed on cross-examination that the only thing he and Ellis discussed were the letters they received from appellant, and that his conversation with Ellis did not concern what they would testify to in court or their plea bargains.

Defense counsel also called DeAndre Piper, who was in the holdover cell with McClendon and Ellis. Piper testified that he was in the holdover cell with a white male and a mixed race or Hispanic male on the day in question. When asked if the two men interacted or talked, he said, "Not that I know of." Defense counsel also asked, "Did you see them or hear them talking or interacting at all?" Piper replied, "I didn't see, hear, no nothing."

After Piper testified, the trial court asked the prosecutor "to be especially diligent" and review her notes after the witnesses testified to ensure the defense could cross-examine them fully. The trial court admonished the prosecutor as follows:

> [I]f there's anything in there that in any way has changed with regard to the testimony that you believe may come from some type of contamination or error or mistake or whatever, I want to make sure that the witnesses testify fully to both sides, but I want the defense to be able to cross-examine them as fully.

The trial court denied the defense's motion for mistrial and objection to the witnesses' testimony, and allowed McClendon and Ellis to testify before the jury.

Texas Rule of Evidence 614, commonly referred to as "the Rule," codifies the witness-

sequestration rule. When invoked by either party or the trial court, the Rule mandates, with some exceptions, the exclusion of witnesses from the courtroom during trial so they cannot hear the testimony of other witnesses. TEX. R. EVID. 614. We review the trial court's decision on whether to exclude a witness who has violated the Rule for an abuse of discretion. *Webb v. State*, 766 S.W.2d 236, 240 (Tex. Crim. App. 1989); *State v. Saylor*, 319 S.W.3d 704, 710 (Tex. App.—Dallas 2009, pet. ref'd); *Mitchell v. State*, 238 S.W.3d 405, 412 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd).

When the Rule is violated, the trial court may, taking into consideration all of the circumstances, allow the testimony of the potential witness, exclude the testimony, or hold the violator in contempt. *Bell v. State*, 938 S.W.2d 35, 50 (Tex. Crim. App. 1996); *Jimenez v. State*, 307 S.W.3d 325, 334–35 (Tex. App.—San Antonio 2009, pet. ref'd); *Harris v. State*, 122 S.W.3d 871, 882 (Tex. App.—Fort Worth 2003, pet. ref'd). A violation of the rule is not in itself reversible error, but only becomes so where the objected-to testimony is admitted and the complaining party is harmed. *Webb*, 766 S.W.2d at 239–240. Two criteria that have been used for determining injury or prejudice are (1) whether the witness actually conferred with or heard testimony of other witnesses and (2) whether the witness's testimony contradicted testimony of a witness from the opposing side or corroborated testimony of a witness he or she had conferred with or heard. *Bell v. State*, 938 S.W.2d 35, 50 (Tex. Crim. App. 1996) (citing *Webb*, 766 S.W.2d at 240); *Lewis v. State*, 402 SW.3d 852, 858 (Tex. App.—Amarillo 2013, no pet.).

Although the record shows McClendon and Ellis violated the Rule by talking in the holdover cell after the Rule was invoked, there is no indication the two witnesses discussed their testimony regarding the instant offenses. Apart from Ellis's testimony that he saw appellant with the gun during the offense, their trial testimony was consistent with their prior statements to the police. Appellant argues that the fact that the witnesses discussed the letters they received from

him prejudiced his case, but McClendon and Ellis did not corroborate each other's testimony on this point. Instead, each witness testified about letters *he* received from appellant, not the other letters written by appellant. Accordingly, the trial court could have concluded the brief holdover cell conversation between McClendon and Ellis did not influence their trial testimony, and that appellant was not harmed by the violation of the Rule. We overrule appellant's tenth issue.

## 5. Modification of Judgments

In all three cause numbers, appellant pleaded not true to the indictments' two enhancement paragraphs alleging prior felony convictions for possession of a controlled substance with intent to deliver over four grams and aggravated robbery. The jury found the enhancement paragraphs to be true. The trial court's judgments, however, state "N/A" in the space provided for the pleas to the first and second enhancement paragraphs and the findings on the first and second enhancement paragraphs. Because the necessary information is available in the record, on our own motion we modify the trial court's judgments in 05–13–00070–CR, 05–13–00084–CR, and 05–13–00090–CR to show appellant pleaded not true to the two enhancement paragraphs and that the jury found the enhancement paragraphs to be true. *See* TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) (providing that an appellate court has the authority to modify incorrect judgments sua sponte when the necessary information is available to do so); *see also Tyler v. State*, 137 S.W.3d 261, 267–68 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (authority to modify judgment is not dependent upon a party's request).

As modified, we affirm the trial court's judgments.


/ Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
130070F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

DOCK TYRONE MURRAY, JR., Appellant

No. 05-13-00070-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F11-45384-V.
Opinion delivered by Justice Myers.
Justices Lang-Miers and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

"Plea to 1st Enhancement Paragraph:  Not True" and "Findings on 1st Enhancement Paragraph:   True."

"Plea to 2nd Enhancement/Habitual Paragraph:  Not True" and "Findings on 2nd Enhancement/Habitual Paragraph:   True."

As **MODIFIED**, the judgment is **AFFIRMED**.    We direct the trial court to enter a new judgment that reflects this modification.

Judgment entered this 9th day of June, 2014.

/Lana Myers/
LANA MYERS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DOCK TYRONE MURRAY, JR., Appellant

No. 05-13-00084-CR    V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. F11-45385-V.
Opinion delivered by Justice Myers.
Justices Lang-Miers and Lewis participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

"Plea to 1st Enhancement Paragraph:  Not True" and "Findings on 1st Enhancement Paragraph:   True."

"Plea to 2nd Enhancement/Habitual Paragraph:  Not True" and "Findings on 2nd Enhancement/Habitual Paragraph:   True."

As **MODIFIED**, the judgment is **AFFIRMED**.    We direct the trial court to enter a new judgment that reflects this modification.

Judgment entered this 9th day of June, 2014.

/Lana Myers/
LANA MYERS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

| | |
|---|---|
| DOCK TYRONE MURRAY, JR., Appellant | On Appeal from the 292nd Judicial District Court, Dallas County, Texas |
| No. 05-13-00090-CR     V. | Trial Court Cause No. F11-45386-V. Opinion delivered by Justice Myers. |
| THE STATE OF TEXAS, Appellee | Justices Lang-Miers and Lewis participating. |

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

"Plea to 1st Enhancement Paragraph:  Not True" and "Findings on 1st Enhancement Paragraph:   True."

"Plea to 2nd Enhancement/Habitual Paragraph:  Not True" and "Findings on 2nd Enhancement/Habitual Paragraph:   True."

As **MODIFIED**, the judgment is **AFFIRMED**.    We direct the trial court to enter a new judgment that reflects this modification.

Judgment entered this 9th day of June, 2014.


/Lana Myers/
LANA MYERS
JUSTICE